HOOD, Judge.
The plaintiff in this tort action, J. L. Deshotels, claims damages for personal in *689 juries, medical expenses and loss of wages alleged to have been sustained by him as the result of a collision between a pickup truck being driven by Gary Don Vidrine and an automobile being driven by Nelwyn Fonte-not. Plaintiff was riding as a guest passenger in the Vidrine truck at the time the accident occurred. The suit was instituted against Fontenot and against Southern Farm Bureau Casualty Insurance Company, the liability insurer of the driver of the Vidrine truck.
This case was consolidated for the purposes of trial and appeal with three other suits, all arising out of the same accident, which suits were instituted by other plaintiffs against the same defendants. Judgment is being rendered by us in each of these consolidated cases on this date. See Deshotels, individually and for and in behalf of his minor son, Michael Deshotels v. Southern Farm Bureau Casualty Insurance Company, et al., La.App., 164 So.2d 694; Hebert v. Southern Farm Bureau Casualty Insurance Company, et al., La.App., 164 So.2d 687; and Michel v. Southern Farm Bureau Casualty Insurance Company, La.App., 164 So.2d 686.
After trial on the merits, the trial court concluded that the drivers of both vehicles were negligent, and that the negligence of each was a proximate and contributing cause of the accident. Judgment was rendered in favor of plaintiff in each of the consolidated cases. In all of said cases, except the one instituted by Eva Lou Michel, judgment was rendered against both defendants, in solido, but in the suit instituted by Eva Lou Michel the plaintiff dismissed her action as to defendant Fontenot, and the judgment in that case was rendered only against Southern Farm Bureau Casualty Insurance Company. Defendants have appealed in each case. In two of the consolidated cases, that is, the instant suit and the suit filed by Isaac Deshotels, individually and in behalf of his minor son, Michael Deshotels, the plaintiffs have filed answers to the appeal seeking increases in the amounts awarded as damages.
The accident which gave rise to these suits occurred at about 11:30 p. m. on Saturday, December 29, 1962, on Louisiana Highway 10 in Evangeline Parish. At the time the accident occurred the pickup truck was being driven in an easterly direction on that highway by Gary Vidrine, who was then 17 years of age. Passengers in the truck were J. L. Deshotels, plaintiff in this suit; Michael Deshotels, a minor in whose behalf one of the consolidated cases was filed; and Rolland Boone. The Fontenot car at that time was being driven in a westerly direction on the same highway by Nelwyn Fontenot, the passengers in that car being Eva Lou Michel and Josephine Hebert, both of whom are plaintiffs in suits which are consolidated for trial with this one.
Shortly before the collision occurred, Vidrine and his passengers left the Siesta Club, which is located on the south side of Highway 10, and they proceeded to drive in an easterly direction toward Ville Platte. The truck traveled in that direction a distance of about 560 feet, from the place where it had been parked near the Siesta Club to a point almost directly in front of the Bel Amour Club, which also is located on the south side of the same highway, where it collided with the Fontenot automobile. The evidence shows that as these two vehicles were approaching each other from opposite directions Fontenot turned his vehicle from the north, or westbound, lane of traffic to his left, or to the south, directly in front of the approaching Vidrine truck, and the collision occurred in the south, or eastbound, lane of traffic. Fontenot and his passengers explain that they intended to go to the Bel Amour Club, and that Fonte-not’s purpose in turning to his left at that time was to park his car in a parking place on the south side of the highway directly in front of the Bel Amour Club.
Highway 10 at that point is paved with concrete, and it is straight and level. It is intersected on the south by Plighway 13, the latter thoroughfare being divided at that junction so that it forms what is known as *690 a “Y” intersection, one fork of Highway 13 turning east as it joins Highway 10, and the other fork turning west as it runs into or intersects that highway. A neutral ground is formed by this division or fork of Highway 13, and the Bel Amour Club is located on this neutral ground in the middle of the “Y” intersection. The Club faces north and it is located very close to the highway, the evidence showing that the north wall of the Club is only 21j4 feet from the south edge of the hard-surfaced portion of Highway 10. It is apparent that the parking area between the concrete slab of Highway 10 and the north wall of the Bel Amour Club, including what might be considered as the shoulder of the highway, is very narrow.
A railroad track, which runs north and south in that immediate area, crosses Highway 10 west of the above-described “Y” intersection, between the Siesta Club and the Bel Amour Club. This track is located 324 feet east of the Siesta Club and 235 feet west of the front entrance of the Bel Amour Club, the total distance between these two Clubs being about 559 feet.
The evidence shows that the Vidrine truck had reached a speed of 45 miles per hour by the time it got to the point where the railroad crosses Highway 10, and that it was traveling at that speed when the driver and occupants of the truck first saw the Fontenot car turn to its left into the eastbound lane of traffic. It also is established that Vidrine applied the brakes of his truck with sufficient force to cause the wheels of the truck to skid a distance of 63 feet before the collision occurred. Fontenot had been driving his car at a speed of 50 to 55 miles per hour shortly before the accident occurred, but as he approached the Bel Amour Club where he intended to stop he reduced his speed and was traveling about 10 to 15 miles per hour as he turned, and he continued to travel at that speed until the collision occurred. Although Fontenot, like Vidrine, realized that a collision was imminent before it occurred, Fontenot did not • apply his brakes or attempt to bring his car to a stop before the accident occurred.
The weather was clear and the highway was dry at the time the collision occurred. The lights of both vehicles were burning, and there was nothing to obstruct the vision of either driver. The right front portion of the truck struck the right front portion of the car.
Fontenot and the occupants of his car maintain that the front portion of that car had completely crossed the eastbound lane of traffic and that the front wheels of the Fontenot car were in the parking area in front of the Bel Amour Club when the collision occurred. According to their testimony, therefore, the collision occurred on the shoulder of the road or in the parking area of that Club rather than on the hard-surfaced portion of the highway. They further state that the force of the blow knocked the Fontenot car backward three or four feet in exactly the opposite direction from that in which it had been traveling. Their testimony as to where the collision occurred conflicts with that of the state trooper who investigated the accident, and with that of the driver and occupants of the Vidrine truck, all of whom testified that the point of impact was on the concrete slab, in the eastbound lane of traffic of the highway. The photographs taken by the state trooper within a few minutes after the vehicles had been removed from the center of the highway show that the oil and debris left on the road as a result of the collision were located on the eastbound lane of traffic, which photographs support the version of the accident given by Vidrine and the occupants of his truck. The evidence is convincing that the collision occurred in the eastbound lane of traffic, as stated by Vidrine and his passengers, rather than on the shoulder or parking area of the Club, as stated by Fontenot and the occupants of his car.
There is another reason, however, why we cannot accept the testimony of Fontenot *691 and his passengers as to the place where the accident occurred. All of these witnesses testified that as they approached the Bel Amour Club two cars were parked at an angle in the narrow parking area in front of that Club, and that Fontenot was pulling in between these two cars for the purpose of parking between them when the accident occurred. As we have already pointed out, the evidence shows that the north wall of the Bel Amour Club is located only slightly more than one car length from the south edge of the concrete slab of the highway. The rear ends of the two parked vehicles, therefore, must have extended northward to a point within a very few feet of the hard-surfacing. And the evidence establishes that the right front part of the Vi-drine truck struck the right front part of the Fontenot car, the blow causing the Fontenot car to be driven backward two or three feet in the opposite direction from that in which it had been traveling. We are unable to visualize how the two vehicles could have collided in the manner and at the place stated by Fontenot and the passengers of his car, without causing either of the two vehicles which previously had been parked in front of the Club to be struck or touched, and without knocking the Fontenot car in a westerly direction instead of straight back. We agree with the trial judge that the collision occurred in the eastbound lane of traffic.
Some of the witnesses also disagree as to the distance the two vehicles were from each other when Fontenot turned to his left and entered the eastbound lane of traffic. The driver of the Vidrine truck and all of his passengers testified that the vehicles were relatively close to each other when the turn was started, their estimates as to this distance ranging from three or four car lengths to 150 feet. All of the occupants of the truck, including the plaintiff in this suit and the plaintiff in a consolidated case, agree that Vidrine applied the brakes of the truck as soon as it was possible to do so after the approaching car had started to make a left turn in front of them, and that he caused the wheels of the truck to skid from the place where the brakes were applied up to the point of impact. Fontenot and the two passengers in his car testified that the Vidrine truck either had not reached the railroad track or that it was crossing the track at the time Fontenot began his left turn, and at that time they felt that Fontenot had time to complete the turn safely before the truck would reach them. The railroad was 235 feet from the northeast corner of the Bel Amour Club, so according to Fontenot and his passengers the two vehicles were more than 235 feet apart when the left turn was started.
If the Vidrine truck had maintained its maximum speed of 45 miles per hour until the vehicles collided, then it would be apparent that the Fontenot automobile, which was being driven from one-fourth to one-third as fast as the truck, would have traveled from 58 to 78 feet in its wrong lane of traffic while the truck was covering the 235-foot distance from the railroad to the point of impact. Actually, the truck could not have maintained that speed up to the point where the vehicles collided, because the wheels of the truck skidded 63 feet of that distance, so if Fontenot’s recollection of how the accident occurred is accepted, then we must also conclude that his automobile traveled considerably more than 58 to 78 feet in its wrong lane of traffic before it reached the point where the collision occurred. The evidence docs not show the width of the concrete slab of this highway, but from the photographs we think it is reasonable to conclude that the slab was not over 24 feet wide, the south lane of traffic being not over 12 feet in width. And since the accident occurred in the south lane of traffic, it follows that the automobile could not have traversed the entire 12-foot width of the south lane of traffic before it collided with the truck.
Fontenot testified that 'T was coming in, taking a left, a left hand turn.” Eva Lou Michel stated that “when we got close to *692 the place, I mean we slowed down and made a left turn, and we were fixing to park slanted, you know, on the side of another car, next to the building.” And, Mrs. Hebert testified that “the way that we were coming, we would’ve parked at an angle,” and that “we were turning at an angle.” We find nothing in the testimony of these witnesses which indicates or infers that Fontenot had made such a slight deviation from his westward course of travel that he merely edged over into the wrong lane of traffic and proceeded down that lane gradually moving more to his left until he reached a point just a few feet south of the center line of the highway after he had traveled a distance of at least 58 to 78 feet in the wrong lane. We think it more logical and consistent with the testimony of all of the witnesses to conclude that Fontenot made a definite turn to his left at about the angle which he intended to park. With that conclusion, we feel that his car could not have traversed a distance of more than 20 or 30 feet between the time he crossed the center line of the highway and the time of the accident. While he was covering that distance, the truck could not have traveled more than four times that far, which indicates that the truck was within 80 to 120 feet of the place where the accident occurred when Fontenot crossed the center line.
Considering the established speeds of the two vehicles, we conclude that the estimates given by Vidrine and the occupants of his truck as to how far apart the vehicles were when the left turn was begun are more accurate than those given by other witnesses.
The trial judge found that Fontenot was negligent in turning to his left directly into the path of the oncoming Vidrine truck, and that his negligence in that respect was a proximate and contributing cause of the accident. We think the evidence supports that conclusion, and that judgment was properly rendered against Fontenot in favor of all plaintiffs, except the one who dismissed her action against him.
The trial judge further found that the driver of the Vidrine truck was negligent, and that his negligence was also a proximate and contributing cause of the accident. In his written reasons for judgment the trial judge said, “Mr. Vidrine was apparently still accelerating at the time of the accident since he started his pickup at a standstill from the Siesta Club, approximately four hundred (400) feet from where the accident occurred,” and that “Gary Vidrine was negligent in driving at such a high rate of speed in this location under the circumstances described.”
The trial judge was in error in finding that Vidrine was still accelerating at the time of the accident, because the evidence establishes without contradiction that the truck skidded a distance of 63 feet up to the point of impact. Also, by actual measurement with a tape the distance from the place where the truck was parked just prior to the accident to the place where the collision occurred was determined to be 559 feet, instead of 400 feet as found by the trial court. These erroneous conclusions are probably due to the fact that the testimony had not been transcribed when the judgment was rendered, and the trial judge therefore did not have an opportunity to review the evidence prior to deciding the case. While we agree with the trial court that Vidrine might be decreed to be negligent if he actually had continued to accelerate instead of reduce his speed after he became aware of the danger, we have already pointed out that the evidence establishes that this was not the case. We are convinced that Vidrine saw the Fonte-not car begin its left turn as soon as it was reasonably possible for him to do so, and that immediately thereafter he exercised reasonable diligence in attempting to bring his truck to a stop and to avoid an accident.
Plaintiffs contend, however, that Vidrine was negligent in driving at a speed of 45 *693 miles per hour at this location. The evidence shows that the place where the accident occurred was on an open highway, outside the corporate limits of any city or town, and that the speed limit for automobiles at that point was 60 miles per hour and for trucks 50 miles per hour. Vidrine was clearly operating his truck within the authorized speed limit. Near the intersection of Highway 10 and Highway 13 there were located four night clubs, two filling stations, and two grocery stores. The accident occurred between Christmas and New Year’s Day, and as pointed out by counsel for plaintiffs, night clubs were frequented a great deal during that holiday period.
Although the evidence shows that some or all of the night clubs were open at the time the accident occurred, there is no showing that either of the filling stations or either of the grocery stores were open at 11:30 that night. Also, while the evidence shows that some cars were parked around the night clubs in that area, we do not interpret the evidence as showing that traffic was congested or that there was any reason for a person who was familiar with the area to reduce his speed to one slower than 45 miles per hour as he was traveling on Highway 10. The Bel Amour Club was located very close to the concrete slab, but the other places of business were located at greater distances from the highway. Under the circumstances presented here, we cannot agree with plaintiffs that the actions of young Vidrine in driving the truck at a speed of 45 miles per hour in his area constituted negligence on his part.
In our opinion the trial judge correctly held that Fontenot was chargeable with negligence which constituted a proximate cause of the accident. We think he erred, however, in concluding that the driver of the Vidrine truck was also negligent and in condemning the defendant, Southern Farm Bureau Casualty Insurance Company, as the insurer of the driver of the Vidrine truck, to pay damages.
The injuries sustained by plaintiff in this suit, J. L. Deshotels, were correctly described by the trial judge in his written reasons for judgment as follows: “This 18 year old boy was examined and treated by Dr. Manuel for a severe laceration of the forehead which was sutured. It appears that he was hospitalized for a period of seven (7) days and after which he was convalescing for a period of about six (6) weeks. The laceration of the forehead has caused a severe scar on the forehead and a smaller scar across the bridge of the nose which is not apparent any longer. The forehead scar is apparent and does amount to a disfigurement of the face.” Under these facts, the court awarded plaintiff the sum of $1,000.00 for pain and suffering, $500.00 for disfigurement, and $245.00 for loss of wages. In our opinion these awards are fair and adequate, and are in keeping with awards made in other cases involving similar injuries.
For the reasons herein set out the judgment appealed from is reversed insofar as it condemns defendant, Southern Farm Bureau Casualty Insurance Company, to pay damages, and judgment is hereby rendered in favor of that defendant, Southern Farm Bureau Casualty Insurance Company, and against plaintiff, J. L. Deshotels, rejecting plaintiff’s demands as to that defendant. In all other respects the judgment appealed from is affirmed. The costs of this appeal are assessed to appellant Nelwyn Fontenot.
Affirmed in part; reversed in part.